We will move on to Chabolla v. ClassPass. And once you get settled, Mr. Schatz, when you're ready. Good morning, Your Honors. Good morning. May it please the Court, Benjamin Schatz of Manette, Phelps & Phillips for Defendant Appellant ClassPass. I'd like to reserve six minutes for rebuttal. Very well. This Court should reverse the District Court and order Chabolla to arbitration because exercising de novo review and applying the governing inquiry notice standard from this Court's Berman opinion, this Court should recognize that ClassPass's webpages provided reasonably conspicuous notice of its terms of use and Chabolla unambiguously manifested assent to those terms. The parties do not dispute that the standard of review is de novo. The parties do not dispute the underlying relevant facts. And the parties do not dispute that the governing legal test is the inquiry notice test. So under the inquiry notice test, the questions presented are, did the ClassPass's webpage provide reasonably conspicuous notice of the terms and did Chabolla unambiguously manifest contractual assent? And a review of the webpages and the entirety of the enrollment process and the full context of the transaction shows that the answers to those questions have to be yes. The undisputed facts are simply that Chabolla visited the ClassPass website. She clicked through four pages, three of which had the terms of use under the action button, and she went through the entire process and created an account. Well, they were under, but there was things between the action button and the terms, wasn't there? Especially as to page one. So looking at screen one, to answer your question, I think the pages are remarkably clean. There's not very much, there's no fluff inserted between any of this. So on page one, that's the page where Chabolla was asked to enter her e-mail address and then click either continue or sign up with Facebook, and she clicked continue. And immediately under those two buttons, it says by clicking. But hold on, but isn't that kind of important, the location, right? The location here, the action item here, why can't we just assume that the person was just typing in their e-mail or signing up for Facebook? How do we know then, based on Berman, that they're agreeing to a contract at this point by doing that which is requested of the page? Because there's a notice right under the buttons that says if you do that, you are agreeing to the terms. And the standard is the prudent, average, reasonable Internet user. And people who use the Internet, which is everybody these days, know how to enroll and know how to do these sorts of things. And the notice text and the terms of use are directly within the line of sight and the vision of the user, and they're in a box. It certainly would have been sort of unambiguous if the button had followed the notice. The button does follow the notice on screen, too. That's true. And, you know, web pages are done in many different ways, and the case law always says as long as the notice and the terms are adjacent to, then that's good enough. It doesn't have to be above. And the button follows the notice on screen, three. That's true. And at what point is she enrolled? She has to scroll through all three, all of these pages, and she has to click all three buttons? To have a membership, yes. Okay. So to sign up for this. To sign up for this, which she does, because it's the last page in which she inputs all of her credit card information. And at that point, it should be clear to anyone that they have made a contract. But at the second page, the big text, I should say, it's indicating just for her name. So there's big text. What is your name? And then the person is asked to enter their information. And, yes, the terms of use is underneath that. But in smaller print, and it is highlighted. And then there's a continue button, the action item. So in your view, you're saying that at that point, then, the person has entered into a contract? Our view is that on all three pages, she's entered into a contract, because she has clicked buttons directly adjacent to notice language, saying that if she does that, she's agreeing to the terms. But, you know, it's not actually necessary to decide when the contract was formed. Was it page 1? Was it page 2? Was it page 3? There isn't anything to do until you get to page 3, right? I mean, it's not until you've actually clicked the button on page 3 that she has any obligations. She's just agreed to terms of use, but that doesn't mean anything, right? If she only clicks the button on page 1, what happens? Well, she has agreed to the terms of use.  But for what? Precisely. She's not going to any classes. They're not collecting any money from her, right? Right. Are they collecting any money if she clicks both buttons on page 1 and page 2? Right. So, I mean, no dispute would arise if someone just went to the first page. That's really not your position, is it, that at the moment that they enter their name, now they've agreed to the terms and conditions? Is that what your position is? Yes, but we don't have to die on that hill. I mean, we don't even have to have that discussion because we know here she went all the way through and signed up and then took a survey about what classes she wanted to take, and then she took classes, and she paid. And then, ultimately, 15 months later, when she had a dispute and wanted a refund and emailed customer service at ClassPass, she said, I have to be honest with you. I get that you have terms of service. I mean, there's no question that she knew what she was doing and that by the time she reached the end, she had to have accepted those terms of use. And Your Honor pointed out, well, you know, the terms of use is in a smaller type font. But that's true in all of the cases. And so we have provided many, many screenshots in our brief to show that this is a perfectly normal and ordinary way that e-commerce is done. And we've cited cases from this court, not just the Berman case that sets the standard, but the three published cases that have followed, Oberstein, Patrick, and Kiba. And there are also four unpublished decisions from this court showing that that standard is very well understood. And that's Dorman, Lee, Alcaraz. And then beyond that, we've cited cases. Well, hold on. In Oberstein, wasn't the notice conspicuously displayed directly above and below the action item? And that's not the case here. And that was in three different locations. So isn't that distinguishable? I don't think so, no. Because Oberstein has the text notice right next to the button, and it has it in three different screens, and that's just like this case where there are three screens. Well, I'm looking at the first screen. That's not the case, counsel, is it? You're looking at the first screen? The first screen.  Enter your email. I'm looking at it right now, and it says enter your email to continue. You enter your email and it has the action item immediately below that. It says continue. So let's just stop there. That's distinguishable from Oberstein, where it was immediately under it. Isn't that accurate? Yes, that's true. But immediately under continue is or, and there's another button. And that's not uncommon. We've cited many web screens where when someone is clicking to advance, there are several options of buttons. And it sounds like maybe what Your Honor is saying is that the notice text should be under each button. No, I guess what I'm saying is what you indicated is that Oberstein is on all fours here and that we should follow it. But when we follow it, it is distinguishable in that context. And placement matters, certainly as we're looking at this. Doesn't that matter? Yes, placement does matter. And I would say that the placement is equivalent. And I'm not saying that Oberstein is exactly this case. I mean, all of these cases are different. Every single web page is different. I have another case where somebody is saying, well, the button was orange, and that distracted the user. I mean, it devolves into very ridiculous arguments about details. But what really matters is if you look at this Court's precedent, as long as the notice text is next to the button and the user presses the button, then that's going to be sufficient. And we've cited many, many district court cases that say the same thing, two of which are from Judge Fitzgerald. So we know he has seen this before. And nobody has picked these things apart in the way that the district court judge has tried to do here and that the other side has tried to do. And it's worth pointing out that the other side doesn't have any case law. We've got well over 20 cases that say, look at our page, and it looks like this page. Like cases should be treated alike, and the agreement should be enforced. Counsel, with Oberstein, it isn't necessarily whether Screen 1 matches there, but the point of the case was that even if there would be issues, that collectively the process would meet the prongs of Berman. So let's say that we disagree with you about Screen 1. What, in your view, would be the reasons that Screen 2 and Screen 3 under Oberstein would correct that, knowing that you disagree with that, but still would correct any issues that we see in Screen 1? Because it's not just about one screen. It's actually about four screens. Remember there was a landing page that she started with where she clicked a radio button to pick a collection of classes. That didn't have the terms of use. These pages did. But you have to look at everything together. It's the full context of the transaction. All of the cases say that. You have to look at everything. And the equivalent analogy here would be if somebody had a three-page contract and wanted to get out of it and said, oh, well, page one isn't the contract, so that's no good, and page two isn't the contract, and that's no good, and page three, well, yeah, I signed that, but that doesn't have the other terms. That's not how contracts work. It's all together. And there's no question that each of these pages flows from the other and builds upon the page that came before. Now, Counsel, I know you wanted to save some time. Do you want to save the remainder of your time? I do, unless the Court has a pressing question. I will have questions afterwards, I'm sure. Thank you. Good morning. Good morning. Good morning, Your Honors. I'm Jessica Hunter on behalf of Plaintiff Appellee Kathryn Chabala. There are a couple of things I want to correct, but first I don't want to distract from the critical issues here. As the panel well recognizes, as the website operator, ClassPass has the onus of designing the webpage in a way that gives the consumer, in this case the appellee, reasonably conspicuous notice and captures an unambiguous manifestation of scent. Well, let's go to his point, though. His point is, hey, if you look at screen two and screen three, the action item is below the terms and conditions listed. Why isn't that enough? So we'll start with screen two, if that's all right, which is almost identical to screen one. The only thing that changes is this request for an e-mail address versus a name, and then, you know, as you rightly pointed out, the location of the button versus the notice text. But other than that, this is not a sign-up page. This is still just a preliminary attempt to offer a deal for $40 in this case. But it tells her if you're signing up, you're going to agree to our terms of use. Do you wish to continue? And the button is below that. So why isn't that for a reasonably prudent Internet user? Why isn't that sufficient to say if you click this button, you accept our terms of use? That's pretty standard stuff. None of us are going to read this stuff. I mean, we're not naive. Nobody's actually going to read this, but it's there. So I think Berman is crystal clear on this issue. The notice text needs to be connected to the button in a way that explains the legal significance to the user. Well, what more did they have to say? What else was legally required on screen two? And then we'll get to screen three. For instance, I mean, I think I could go into other reasons why I might think this might not be enough, but if it had said by clicking continue below or by continuing past this page, you agree to our terms, that would certainly be better. Here it says sign up. But there's nothing on this page that indicates that this is a sign-up page. Well, except that they're asking for your name. That's usually what we do when we sign up. That's usually the first thing that's requested. They ask for a first name and a last name. That's all that was asked? What is your name? That feels like that's signing up. Well, so there's a couple of points I'll make. And there's nothing else requested. Nobody's asking for any other information, no phone number, no Social Security number, no credit card number. Right, which is exactly a reason why I think this is not clearly a sign-up page. There's nothing that says sign up. There's nothing that says create security questions. There's nothing that says create a password. It's simply asking for your name. And, Your Honor, you may have had this experience of, you know, looking at some sort of service or product on a website, and it asks for your name. And the next page you get is a personalized further pitch that says, Judge Bybee, please, you know, sign up for this. I don't think that providing a name. And I'm sure you put your name, Judge Bybee. Yes, exactly. First name and last name, right? So I don't think that this simply asking for a name is a sign-up process. And if you take this out of the electronic contracting world, you know, think about going to an open house. If you're trying to buy a house, you have to write down your contact information, your name, your e-mail. You're not agreeing to buy that house by doing that.  The contract really is not formed in any significant way until you get to page 3. I mean, I would say there's not a contract formed at all, but — There's no contract formed here? For terms, there's a contract for the 40 percent discounted trial offer of a month of discounted fitness classes at local providers. But, no, I don't agree that on page 3 that there's acceptance of the terms. I understand that my membership will automatically renew to the $75 per month plan applicable tax until I cancel. I agree to the terms of use and then a button below that says redeem now. That's the only button that will make all of this effective. That's just where you entered your cart information. Right. You're correct that redeeming now is the button that redeems the trial offer that's been made. But Berman is clear that the legal significance of that click has to be explained to the consumer. It has to be explicit, and it has to be an unambiguous manifestation of assent. And redeeming now is not manifestation of her assent? What did she think she was doing? That's assent to the offer, which was $40 off of — Right. And one of the conditions was I agree to the terms of use. Your Honor, I — That is the last sentence before the button. Which is another point. I mean, there are arguments that this is, again, not reasonably conspicuous notice. It's not set off. It's, you know, after another sentence, there are — It's just too much to ask him to read two sentences? Well, Your Honor, this is a page that has lots of other text. It has a legal copy on the left. It doesn't, Counsel. The whole thing is set off on the right. Yes, there's other information here, but this is — this is not a particularly confusing — we just see these kinds of things all the time. Look, I'm not very technologically savvy, but even I can fill this page out without a clerk. Thank you. Thank you for clarifying. Again, I just — I want to go back to Berman. Well, if I could ask you, before doing that, on — let me ask the same question that I asked Mr. Schatz, and that's how — why — even if we agreed with you as to Screen 1, if, as Judge Bybee was saying, Screen 3 is perhaps the most significant and under Overseen we're supposed to look at all of the whole entire process, why would that process, by the time you get to Screen 3, not be sufficient? So that's a great question. The first two pages are a preliminary offer. It's a pitch to learn more about this exclusive deal that's being offered. It's not until the end that, as the panel has rightly pointed out, it's not until the end that you effectuate anything that you put in, financial information. Without that, nothing is really going to happen unless you go through with that last page. So there's no reason on these first two pages that a consumer needs to be or would be on alert for the fact that an 11,000-word, well, more than 20-page contract is being formed. There's plenty of information on page 3 that is not disclosed until you get there. And I think Sellers is clear that if you're going to just try and bind someone by making — through an action that they would otherwise have to take, which here she otherwise has to take this action both to learn more and to get to the point where she can ultimately decide to accept it. That's simply — you know, there's no reason that she should be looking for the contract on that page. And I don't think once we get to page 3 that we can either expect her to go back, say, oh, what was on those pages, was there anything, when it wasn't the contractual nature at the time she was on those pages wasn't clear. So I — just at page 3, and I'm repeating myself, but there's no reason to go back. So in your mind, so if there were a page that had enter your email, enter your name, enter your email, and enter your financial information, and then indicate by signing up you agree to these terms, and then the action button, that would be sufficient, you agree with that? Certainly, if the action button said sign up, if it said continue, it might be a closer question. I'd have to see it. It's all fact-intensive, but yes. And so this goes to Judge Fitzgerald's question, which is the fact that they're in three separate pages, that that is not enough, is what you're saying? I don't think that the fact that there are links to the terms on three separate pages really does anything for class pass here. This is another — The fact that it was repeated three times? Out of four pages, you had three different pages to figure out that you were going to be signing up, accepting their terms of use. Well, this is another way that this case is distinguishable from Oberstein. That one said sign up, sign in, and then purchase. You know, as I've said, these first two pages — Are you suggesting that the fact that they repeated it on three pages is actually more likely to confuse her? No, not more likely to confuse her, just that the first two pages — Is three pages worse than one page or better than one page for giving notice to the consumer? I'm not sure that it's really either. It depends on what the page looks like and what's being asked of the consumer on that page. I, you know, again, I would have to, of course, see the actual example to give you my fulsome opinion on any of these. But they could find her on the first page if they really wanted to. I wouldn't, you know, rule that out. But you'd really have to ratchet up the level of notice that's being provided. You know, you'd have to hit the consumer over the head with the fact that you are agreeing at this preliminary stage to our 11,000-word contract when you haven't even made a decision whether you want to take us up on the deal that we're offering you and we haven't provided all the information about that deal. I think it's theoretically possible that it could be done, but I don't think it was done here. Counsel, Mr. Shast mentioned the post-Berman cases both on the Ninth — from the Ninth Circuit and then the district courts. Is there a particular case that you feel the reasoning — obviously not binding, of course, but the reasoning is helpful to the position you're taking here post-Berman? I mean, sure. I think one thing that counsel makes a point of is saying that this is — she's signing up for a recurring membership and the fact that it's not a trial when, in fact, it is. If you look at something like Heba v. Warner Brothers, the court there is saying in that case that this was a game that was downloaded. Downloading something to your phone is something different than just being on a Web page once. Anything — do you have any case that involves a term of service or terms of use? So in that case, it — in that case that I just mentioned, the connection is play, the game, play. And by tapping play, I agree. But there the court, you know, made the point that this is not a Web page. It's an app that the person is downloading. They intend to keep. Also, there's very minimal text on those pages. So if you're looking at that, the text that you're going to read is the text that is important. Here there's lots of other things that are important to the other purpose that the consumer has here, which is not to sign an 11,000-word contract. It's to investigate this deal. So your eye is drawn to things on the left. Would that suggest, then, that ClassPass should have added more pages here? No. There should have been maybe 10 or 11 or 12 pages. No. If we'd had 12 screens, three of which had buttons and used terms of use, we would have been better off here? No, I don't agree with that. I think from a consumer perspective, that length may wear the consumer down. I think that's right. But at some point, they've got to be able to convey certain kinds of information as to what they're promising to give you and what you're promising to give them. Right. So, again, they could – Oberstein, for example, is a case where the person is creating an account, then signing into the account, then checking out, and all of that was clearly labeled, and that was the purpose of those pages. This could all be solved, couldn't it, very, very easily if we just required a separate button that says, I agree to your terms of use. Absolutely. But we have said that that's the one thing you don't have to do. We've made that pretty clear, haven't we? That would solve all of the problems if we just said, have a separate I agree to the terms of use button. But no court has ever required that. Is that correct? I would agree with that, Your Honor. It would solve the problem. I think that the law has been clear that that would solve the problem. So a website designer like ClassPass should know that if they want to not be here in front of you, that they could do that. They didn't do it. So because of that, they're the ones taking the risk that a reasonable Internet user has not had reasonably conspicuous notice and has not manifested an unambiguous manifestation of assent. Counsel, implicit in that question and some of the other questions that my colleagues have asked is the concern that what you're really doing is asking us to sort of decree certain magic words that have to be used. And this court passed up the opportunity, I suppose, to do that in Berman. In fact, the reasoning of Berman would seem to be opposite. It's been pointed out these websites come in a variety of forms in all of this. It's what would be the correct thing to do in your view that would still leave a certain amount of flexibility for two web designers to approach this in a way that they think makes sense, which would be consistent with Berman? Or do you think there's just one right way of doing it other than the button, of course, but, again, that's not something that's required? I see my time is expiring. If I can just finish.  So I think ClassPass at some point says it was designed to draw attention to this or it was designed to get her assent or put her on notice. I mean, it's simply not a serious argument. If you look at their pages, they know how to make things bold. They know how to make even the auto-renewal text at the very bottom of page ER-102, which is screen one, bigger than this assent text. They know how to do a better job. But it creates friction in the buying process, so they make a decision not to do it. So I don't think I disagree that Berman is requiring magical words. It's just saying — I feel Berman is the opposite. My concern is that you're asking us to prescribe magic words if we were to affirm here. I don't think so. Berman, it's just clear that the legal significance of the button click that signals assent in the mind of the website operator needs to be made explicit. That doesn't mean magic words, and if you leave an S off of the end of the word or misspell a word or say, you know, by submitting your order and then the button says purchase, those are the same thing. A reasonable Internet user would know that. But that's not what happened here. On page three, there's no explanation of the significance of clicking the button beyond the obvious of redeeming the $40 deal. And I know you're over your time, but just a quick question. And you certainly, you mentioned this earlier, you wouldn't advocate for having, like, you know, multiple pages, eight pages, ten pages or whatever, because that would confuse the user. So it would make sense to have it in one page, max two or something, where it's clear that the person is, by signing, by pressing the button, they are then agreeing to those terms and conditions. Sure. I agree. And ClassPass could have done it up front very clearly under this Court's precedent with something like a sign-up for a ClassPass account page that would have made it clear that that's what, you know, the user wants to have a long-lasting relationship with this through an account. And if you want to do that, you have to agree to our terms. Here they are. Again, that's not what they did. You know, we've been over it, but I disagree that the first two pages are clear about signing up. Any other questions? No. Thank you, Counsel. Thank you. Could have done it better is not the standard. The standard is reasonably conspicuous. And Chabola's theme that the onus is on ClassPass to create the website is fine. We acknowledge that. But ClassPass met that. But you could have done it better. Well, but that's true in every case. That's not the test. And it couldn't be the test. And it certainly shouldn't be the test. Unless we're willing to go to the simple solution that you have to have a button that says I'm pressing this button because I agree to the terms of use. And that would be the defensive position that a company like ClassPass would have to take if we keep lopping things off and disapproving things. I mean, there's no place else for them to go. That would be a And it may be the most upfront, honest thing for your clients to do. But that's not what we've required. That's true. The law has not required that. And, frankly, going that way, you know, I don't want to say it would break the Internet, but it certainly would change e-commerce tremendously and would flood this Court with suddenly lots and lots of suits from everybody who said, well, all of these pages weren't quite good enough because they didn't meet the standard that the Court had set. My point, and to echo your concern or your observation, Judge Bybee, is that these pages that ClassPass had and Chabola used are about as clean and clear as you can get. They are actually much better than many of the cases that are in the precedent that have been approved.  Well, they're different than overseen. Okay. So they're maybe different than overseen. What's the closest case that you have to your to this case? I just — honestly, I just want to know because I've been looking. Well, Patrick is a good place to go. That's this Court's published opinion. And the Patrick page, I think, is sort of messier, a lot messier than this one. But, you know, every company has a different web page. There's no one style, nor necessarily should there be, as long as the consumers are not being misled. And this notion that we heard about, you know, there should just be one sign-up page, that's not how it works. That's never a standard. The sign-up is a process. And there's nothing wrong with using multiple pages. In fact, that emphasizes to the user, you know, every time you keep going, you are agreeing yet again where this is headed. So if we don't have a case squarely on point with what's happened here, and we have to make a decision, and we have to draw a line, where should we draw the line in this case? Is this the case? I'm not sure there's a line that needs to be drawn. As I pointed out, this Court has already published a number of memorandum dispositions that basically say, oh, we looked at the page, the novo review, it's clear, the text is next to the button. That's good enough. I mean, it's not necessary that every panel and every Court look at every webpage and say, well, it could be this or it could be that or you could change it. Believe me, counsel, I've looked at so many webpages right now, I can't tell you, you know. That's why I'm trying to find one that's similar to this in any case that we've had, and I don't think I've found something. Well, I think that the ones that we've got on the brief are close. And that may be all that we need, certainly. I mean, there's not going to be one that's exactly like that. I would say this appeal provides you with the ingredients for a perfect and easy reversal. You've got a de novo standard of review. You've got very favorable facts for class pass in terms of what Chibola did. And the case law is very strong to enforce. You know, it may not be exactly on all fours. We haven't found another company's webpage that looks exactly like ours. But as Judge Fitzgerald pointed out, it would be, and I may be paraphrasing and putting my own view into it, it would be wildly inconsistent to rule the other way in this case based on all of the existing precedent that's already out there. Counsel, I'm sorry. No, go ahead. If this is the flip side of the concern that I voice to the appellee, if we were to affirm here, then what would keep parties from saying, oh, we have terms of use and it's in the blue hyperlink, so therefore, and the page isn't super duper cluttered. I don't think that's what Berman says. So what, in your view, would be, with your reasoning or a reversal here, keep someone from making that argument in the future, which, in my view, is inconsistent with Berman? The test is whether the reasonably prudent Internet user would see and notice the text. That's the test. And courts look at the size and the color, and there's all kinds of different design elements that go into it. But the design elements here are perfectly consistent with all of the design elements in other cases. And so we're not asking this court to come up with a new rule. You don't have to. You can simply say, this is good enough, just like all of the other cases. Any other questions?  Any other questions? Thank you, counsel. Thank you, Your Honors. All right. The matter of Chabola versus class pass will be submitted. We appreciate counsel's argument today. Thank you very much.
judges: BYBEE, MENDOZA, Fitzgerald